[Civ. No. 3505.   Fourth Dist.   Feb. 28, 1946.]

JAKE W. GARDNER, Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION and PERCY F. BALLINGER, Respondents.

Strother P. Walton for Petitioner.

R. C. McKellips and Joseph Sheehan for Respondents.

MARKS, J.—This is an original proceeding in this court to review an award of the Industrial Accident Commission in favor of Percy F. Ballinger, the employee, against Jake W. Gardner, his employer, for injuries received on December 19, 1943.

Jake W. Gardner owned a cocktail bar at 1043 Broadway in Fresno. Ballinger worked for Gardner as day bartender. J. F. Blake was the night bartender. On December 19, 1943, Ballinger's left ankle was broken by kicks inflicted by a Mr. Brooks whom Ballinger was ejecting from the premises.

 The sole question presented here is whether or not the evidence sustains the finding of the commission to the effect that the injuries arose out of and in the course of Ballinger's employment.

The evidence on this question is sharply conflicting and it seems to us that the contention of petitioner may be supported by a preponderance of the evidence and that the commission might well have decided the case in his favor although there is evidence to the contrary supporting the award.

The rules governing us under such circumstances are clearly set forth in *Ledson* v. *Pacific Indemnity Co.*, 105 Cal. App. 328 [287 P. 566], as follows:

"It is elementary that the findings of the Industrial Accident Commission are subject to review only in so far as they have been made without any evidence whatever in support

thereof. The jurisdiction of an appellate court in cases of this character is limited strictly to determining whether there is evidence sufficient to sustain the award. It is not the function of the courts to determine the credibility of the witnesses or the weight to be attached to their testimony. With these subjects we have nothing to do as the Commission is the final arbiter on questions of fact. It may be that a different conclusion could have been reached by the Commission and had it been so reached that it would have been fully supported by the evidence. Whatever our views may be upon the subject are of no consequence as we have no power to disturb the findings of the Commission when supported by evidence. Its conclusion upon a question of fact upon conflicting evidence is final.''

A decision of the question presented requires a brief summary of a portion of the evidence. As the commission accepted the evidence offered by Ballinger as true we will summarize the evidence supporting the award and will disregard evidence to the contrary although it was amply sufficient to have supported a decision in petitioner's favor.

Ballinger's regular hours were from eight o'clock in the morning to four in the afternoon. He was required to put the place in order and prepare for its opening at ten o'clock. He testified that it was frequently necessary for him to reach his place of employment by seven or seven-thirty in the morning in order to perform these duties.

The night bartender relieved Ballinger at four o'clock each afternoon. However, Ballinger had duties to perform after that hour. These consisted of cleaning and putting fresh water in the sinks, icing beer, and otherwise putting the place in order for the night man. He described some of his duties as follows:

''Q. Were you able to do it before he came on? A. Before Kelly (Blake) came on? Q. Yes. A. No, we never had time to do it. When he came on I would go back and look at the beer and sometimes I would put on as many as five cases to ice it up, and when he come on at night he wouldn't have time to do it. Q. Were you under instruction from Mr. Gardner to take care of those duties after the other bartender came on? A. Sure was. Q. How long had you been doing those duties? A. Ever since I had been there. Mr. Gardner would say, 'Have you everything fixed for Grandpa?' and I said, 'Sure'. He was afraid Grandpa would get mad if I

didn't have everything fixed. Q. Did he tell you you were supposed to leave at four o'clock? A. Never did. Lots of times I would get the beer when I got through, I would put on ten or twenty cases of beer. Q. And that had been going on during the entire time you were working there? A. Yes.''

During the afternoon of December 19, 1943, Brooks entered the cocktail bar and asked for a drink of liquor. This was refused by Ballinger because he thought Brooks was intoxicated. About three o'clock Brooks returned and again asked for a drink and was refused for the same reason. Ballinger told Brooks if he did not leave the place he, Ballinger, would put him out. Brooks replied, ''I will get you when you get out from behind that bar.''

At about 3:45 o'clock Mrs. Ballinger came into the place and took a seat at the bar to wait for her husband. Ballinger was relieved by Blake at four o'clock and proceeded with his duties of cleaning up and preparing the place for the night trade. Mrs. Ballinger asked for a package of cigarettes which her husband procured for her. She then asked him to join her in a glass of beer which he did, standing in front of the bar while drinking it. Ballinger described the subsequent events as follows:

''I was standing there drinking a glass of beer and the day girl brought us down a bag of oranges, and I said, 'I will go back and get them,' and I went back and got the bag of oranges and set them on the bar, and I said, 'Oh, I forgot something; I will have to put some beer on ice,' and I looked around and this same fellow was sitting right behind me. He had already claimed he was going to get me when I came out from back of the bar, and I looked around and there he stood, and he made a swing with his left hand and I grabbed him and put him out the front door. He started back again and I put my hand in his face and shoved him out again, and I shut the door and latched the door inside, so he began kicking and knocking to get in, and Kelly, the night watchman (man) said, 'Well, we can't keep the door shut all afternoon,' and about that time a fellow came along that wanted to get in, and Grover Gardner was standing there and in the meantime Kelly was calling the officer. Q. Who is Grover Gardner? A. Jack Gardner's brother, so he unlatches the door and this fellow run right in behind the other boy and grabbed me again, and I grabbed him in a clinch and got him to the door and I couldn't let loose of him, and we landed up outside and we both went down outside. I still had hold

onto him. While I had him in this clinch inside the building there I had him so he never hit me. He didn't strike me at all. He began kicking with both feet as fast as he could, me trying to get him to the door. When we got outside we both went down and I took him down with me. By that time the officer come along and picked him up. Q. When did you find that you had been injured? A. I found it after I got up off the sidewalk. I knew I hurt my leg on the inside when he was kicking but I didn't know it was hurt so bad.''

Ballinger had not completed his duties and had not put the beer on ice when he was injured at about 4:30 o'clock p. m.

Section 62 of the Alcoholic Beverage Control Act, as amended (Stats. 1937, p. 2175; Deering's Gen. Laws, Act 3796), makes it a misdemeanor for any person to sell, furnish or give away any alcoholic beverages to any obviously intoxicated person. A license may be revoked for obvious violations of the same act (§ 40). Thus Ballinger was not only performing a duty imposed upon him by law, but was serving the interests of his employer when he refused to serve Brooks and was acting within the scope of his employment in so doing.

It is obvious from the record we have quoted that the final quarrel and the injury of Ballinger had its inception in the refusal to sell Brooks a drink; that the injury was a result of that refusal in a continuance of that controversy by Brooks.

In a somewhat similar case this view was taken by the Court of Appeals of New York in *Field* v. *Charmette Knitted Fabric Co.*, 245 N.Y. 139 [156 N.E. 642], where it is said:

"The quarrel outside of the mill was merely a continuation or extension of the quarrel begun within. . . . Here, almost in the very act of putting his foot without the mill, the employee is confronted by a danger engendered by his work within. The situation would be hardly different if a struggle, begun back of the threshold, had ended in a fatal blow delivered on the walk."

*McGrinder* v. *Sullivan*, 264 App.Div. 640 [37 N.Y.S.2d 1], is factually similar to the instant case. There the injured employee was a bartender. While on duty he ejected an intoxicated customer from the premises. The customer said, "I will see you again." After the employee had finished his work and had left the place of his employment he was injured by the intoxicated person. The court said:

"Here we have a situation where claimant justifiably expelled a turbulent patron from his employer's bar room. The

latter left with a threat of revenge. Nursing his wrath at the indignity to which he conceived himself to have been subjected he lay in wait for his victim and within sight of the scene of the prior altercation he perpetrated a vicious assault upon him. Under these circumstances we think it must be said that claimant was then in the course of his employment.''

While we have found no California case deciding the precise question here presented, on identical facts, there are cases tending to support the award. Some of them are summarized in *Fireman's Fund etc. Co.* v. *Industrial Acc. Com.*, 61 Cal. App.2d 335 [143 P.2d 104], as follows:

"In the case of *Judson Mfg. Co.* v. *Industrial Acc. Com.*, (1919), 181 Cal. 300 [184 P. 1], it was stated at page 302: 'The right to compensation is by no means restricted to those cases where the injury occurs while the employee is actually presently manipulating the tools of his calling. . . . It seems to us, however, that when an employee has arrived at the premises of his employer and is thereon for the purpose of immediately commencing his actual work, he is performing service incidental to his employment.' In *Freire* v. *Matson Navigation Co.* (1941), 19 Cal.2d 8 [118 P.2d 809], a janitor, employed by defendant, who regularly reported for duty at 8 a. m. arrived at 7:45 a. m. in a taxicab at a pier where the ship upon which he was to work was moored. As he alighted from the cab he was injured by an automobile operated by defendant's employee. In holding that the injury arose out of and occurred in the course of the janitor's employment, the court said at page 13: 'He was obliged to be there on the morning of the accident before 8 o'clock in readiness to go on the pier and thence to his ship at that time.' The court said further on the same page: 'The fact that the accident happened some minutes before plaintiff was to begin work was immaterial.' In *California Cas. Ind. Exch.* v. *Industrial Acc. Com.* (1943), 21 Cal.2d 751 [135 P.2d 158], it was stated at page 754: 'The term "employment" includes not only the doing of the work, but a reasonable margin of time and space necessary to be used in passing to and from the place where the work is to be done. . . . In other words, the employment may begin in point of time before the work is entered upon and in point of space before the place where the work is to be done is reached.' '' (See, also, *Zolkover* v. *Industrial Acc. Com.*, 13 Cal.2d 584 [91 P.2d 106].)

In the Zolkover case, *supra*, the Supreme Court followed

the rule laid down by the Court of Appeals of New York in *Field* v. *Charmette Knitted Fabric Co., supra,* and said:

"However, in the present case the assault commenced on premises which must be considered to have been the proper location for the discharge of the duty which Robinson was sent to perform. If at the time of the first injury Robinson had grappled with his assailant and attempted to disarm him while still within four walls of the premises, it could not be said that additional injuries so received would not be compensable. As the facts in *Field* v. *Charmette, supra,* demonstrate that the same assault may be continuous and be carried outside of the premises, the facts in the present case lead to the conclusion that the sequence of events occurring without opportunity for reflection formed a part of the *res gestae* and constituted one continuous assault."

As there is substantial evidence in the record supporting the award we cannot disturb it here although we may regard the contrary evidence more convincing. (*Zolkover* v. *Industrial Acc. Com., supra.*)

The award is affirmed.

Barnard, P. J., and Griffin, J., concurred.

Petitioner's application for a rehearing was denied March 28, 1946, and petitioner's application for a hearing by the Supreme Court was denied April 25, 1946.